1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**EASTERN DISTRICT OF CALIFORNIA**

10

11

| | |
|---|---|
| M.V.I., | Case No. 1:25-CV-01440-JLT-SKO |
|             Petitioner, | ORDER CONVERTING THE MATTER TO A PRELIMINARY INJUNCTION AND GRANTING THE PRELIMINARY INJUNCTION IN PART AND REFERRING THE MATTER TO THE ASSIGNED MAGISTRATE JUDGE |
| v. | |
| TONYA ANDREWS, ET AL.,[1] | |
|             Respondents. | (Doc. 2) |

12
13
14
15
16
17

## I.     INTRODUCTION

18

Before the Court for decision is M.V.I.'s request for a temporary restraining order, (Doc.

19

2), filed in conjunction with his petition for a writ of habeas corpus brought under 28 U.S.C.

20

§ 2241 challenging his ongoing immigration detention. (Doc. 1.) Having evaluated the TRO

21

request, Respondents' opposition, (Doc. 10), and M.V.I.'s reply, (Doc. 11), alongside the entire

22

record, the Court converts the matter into a motion for preliminary injunction, **GRANTS** that

23

motion **IN PART**, and **REFERS** the matter to the assigned magistrate judge for a determination

24

25

---

[1] Respondents appear to suggest that Petitioner has not sued Golden State Annex's warden. (Doc. 10 at 5, n.5.) Clearly, Petitioner has attempted to do so. If Respondent is suggesting that the Warden has changed, the Court has been unable to identify the new Warden's name. Regardless, the Court would not lack personal jurisdiction over the Warden of the facility because Fed. R. Civ. P. 25(d) would permit the Court to substitute that official's name in for the named Warden. See, e.g., *Krumback v. Wasko*, No. 4:24-CV-04156-KES, 2025 WL 2430736, at *3 (D.S.D. Aug. 22, 2025). Respondent also object to Petitioner naming multiple officials as Respondents in this matter. In the interest of expedience, the Court will defer determinations of these questions to the merits phase.

26
27
28

1  on the merits.

2  ## II.     FACTUAL & PROCEDURAL BACKGROUND

3      On August 20, 2024, Petitioner came into immigration custody immediately after crossing

4  the border into United States. (Doc. 10-1, ¶6; Doc. 10-2 at 2.) U.S. Border Patrol encountered

5  Petitioner and determined that Petitioner was a citizen of Romania, was not a citizen or national

6  of the United States and did not have any valid documents to enter the country. (Doc. 10-1, ¶6.)

7  Petitioner gave immigration officers his information and the address in the United States at which

8  he intended to reside. (Doc 2-2, ¶9.)

9      The Department of Homeland Security released M.V.I. on an Order of Release on Own

10  Recognizance ("OREC") that same day, (Doc 10-1, ¶7; Doc. 10-2 at 3), with instructions to

11  report to the Immigration and Customs Enforcement office in San Francisco, California, upon

12  arrival in the Bay Area. (Doc. 10-1 at 7.) Petitioner was also given a Notice to Appear for

13  removal proceedings in immigration court pursuant to Sec 240 INA. (Doc 2-2, ¶10; *see also* Doc.

14  10-2 at 3 ("Court date and address provided to subject on Form I-862, Notice to Appear."))

15  Petitioner was not required to post bond before being released on his own recognizance. (Doc 2-2,

16  ¶10.)

17      Following release, Petitioner appeared at the ICE office located at 630 Sansome Street,

18  San Francisco, CA. (Doc 2-2, ¶11.) During his appointment, ICE officers instructed Petitioner to

19  go to the Intensive Supervision Appearance Program office at 478 Tehama Street, San Francisco,

20  CA. (*Id.*) M.V.I. complied with the instructions and enrolled in ISAP on October 31, 2024. (*Id.*;

21  Doc. 10-1, ¶8.) As part of Petitioner's enrollment in ISAP, Petitioner was required to install a

22  monitoring application on his personal cell phone for weekly reporting. (Doc. 2-2, ¶12.) ISAP

23  required M.V.I. to take a photo of himself every week, answer phone calls from ISAP officers,

24  and report periodically in person at ISAP and ICE offices. (*Id.*) Petitioner contends that he

25  complied with the requirements of the ISAP program and his ICE order of supervision. (*Id.*)

26      M.V.I. acknowledges that he submitted his weekly check-in photo late on a few occasions.

27  (Doc 2-2, ¶13.) Petitioner claims that he communicated the reason for the delay to his ISAP

28  officer and claimed that he was very ill and unable to stay awake due to health issues, presumably

influencing his ability to take the required photo at the designated time. (*Id*.)  Petitioner claims that he did not receive any formal warnings, threats of arrest, or formal notice of non-compliance from ISAP officials regarding these late submissions. (*Id*.)

Respondents assert that Petitioner did not comply with ISAP reporting requirements and missed his biometric check-ins on November 8, 2024; November 15, 2024; August 20, 2025; and September 17, 2025. (Doc 10-1, ¶9.) Respondents provide no documentation or records other than the declaration from DO Jaimes (Doc. 10-1) to support this assertion, although a copy of Form I-831 provided by Respondents notes that "[r]ecords show that SUBJECT has multiple ISAP violations and is amenable to be remanded back to ICE custody" without identifying the "multiple ISAP violations" in greater detail. (Doc. 10-2 at 5.)

Petitioner came to live in Union City, CA after entering United States, where he lives with wife, his son, his cousin, his cousin's wife, and their daughter. (Doc 2-2, ¶14.) Petitioner's parents and siblings also live in the United States. (*Id*.) Petitioner has a nine-month-old baby who is a US citizen. (*Id*.) M.V.I. is self-employed as a gardener, is fluent in English, and has no criminal record. (*Id*.)

MVI timely filed Form I-589 (Application for Asylum and Withholding of Removal), and has a final individual hearing scheduled for July 17, 2026, at the San Francisco immigration court. (Doc. 2-2, ¶15.) M.V.I. has never missed an immigration court hearing. (*Id*.) Petitioner claims he is interested in an asylum claim because he is a victim of persecution in Europe due to his ethnicity. (*Id*.)

On October 16, 2025, Petitioner attended a scheduled ISAP check in at 478 Tehama Street, San Francisco, CA. (Doc. 2-2, ¶15; Doc. 10-1, ¶10.) He arrived at the facility at 9:45am. (Doc. 2-2, ¶16.) An officer eventually asked him questions about how he was doing before telling M.V.I. that he did not need to use the monitoring application on his phone to take a weekly check-in photo. (*Id*., ¶17.) The officer also told him that he would be getting an ankle bracelet to monitor his "every step" and that M.V.I. would be responsible for charging the device. (*Id*.) Petitioner asked if he had done anything wrong; the officer responded that he had not and that he was receiving an ankle monitor due to a program change. (*Id*.) M.V.I. was instructed to keep his

ISAP application open to continue communicating with the officer via text. (*Id.*) The officer then told M.V.I. to walk down to the ICE office at 630 Sansome Street, San Francisco. (*Id.*; Doc. 10-1, ¶10.)  M.V.I. claims that he asked why and the ISAP officer told Petitioner that it was because "M.V.I. had not been there in a long time." (Doc 2-2, ¶17.)

M.V.I. walked to the ICE office and waited in a line outside of the building for 2 to 3 hours. (Doc 2-2, ¶18.) Upon entering the office, Petitioner claims that an officer engaged M.V.I. in conversation and asked to see his documentation. (*Id.*) M.V.I. claims that he complied, and then the officer asked Petitioner to come back with his passports by the following Monday. (*Id.*) M.V.I. claims that he agreed to look for his passports; however, the officer then told M.V.I. to wait before returning and arresting him. (*Id.*; *see also* Doc. 10-1, ¶10 ("ICE took Petitioner into custody at the ICE Field Office due to his numerous ISAP violations").)

M.V.I. claims that the officers told him before handcuffing him that that he failed to take photos at the ISAP appointment. (Doc. 2-2, ¶19; *see also* Doc 10-1, ¶10.) M.V.I. claims that he relayed that he was late on taking some of the photos because he was sick. (Doc. 2-2, ¶19.) Officers cut the ankle monitor that ISAP officers had placed on Petitioner earlier that day. (Doc. 2-2, ¶19.)

A copy of an arrest warrant provided by Petitioner dated October 16, 2025, lists the following reasons as support for the determination made by the authorizing immigration officer that probable cause exists to believe that M.V.I. is removable from the United States and subject to arrest: "the pendency of ongoing removal proceedings against the subject" and "statements made voluntarily by the subject to an immigration officer and/or other reliable evidence that affirmatively indicate the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law." (Doc. 12-1 at 2.) The arrest warrant does not contain mention of the alleged ISAP violations identified by Respondent as the reason for Petitioner's detention.

Following his arrest, M.V.I. was held for the remainder of the day in a small room at the 630 Sansome Street facility with approximately 3 other individuals. (Doc. 2-2, ¶20.) M.V.I. remained detained there until around noon the following day. (*Id.*) Petitioner claims that

4

1    Respondents provided Petitioner with a Mylar emergency blanket and yoga mat during his

2    overnight detention because of cold temperatures. (Doc. 2-2, ¶21.)  Petitioner also claims that the

3    room in which Petitioner was detained had no separation between the sleeping area of the room

4    and the toilet other than a short wall. (*Id*.) Petitioner claims that ICE provided him bottled water,

5    a small burrito and some apples to eat, and that Petitioner could not sleep because the room light

6    remained on all night. (*Id*.) Petitioner also claims that he shivered from the cold and felt back

7    pain. (*Id*.)

8        M.V.I. remained detained in the ICE Field Office until the day following his re-detention.

9    (Doc. 2-2, ¶22.) At approximately noon on October 17, 2025, ICE officers placed M.V.I. in full

10   restraints including handcuffs and ankle, and foot shackles. (*Id*.) Petitioner claims the left marks

11   on his wrists. (*Id*.) Officers then escorted Petitioner to the building basement and loaded him into

12   a transport van with other detainees. (*Id*.)

13       M.V.I. arrived at Golden State Annex on the evening of October 17, 2025. (Doc. 2-2, ¶23;

14   *See also* Doc. 10-1, ¶10 ("Petitioner was then transferred to Golden State Annex ICE Processing

15   Center.")). At that point, Petitioner claims that he had been deprived of sleep for 24 hours since

16   his arrest. (Doc. 2-2, ¶23.)

17       Petitioner was placed in a hallway upon arrival at the Golden State Annex before finally

18   being assigned to cell with bed access at 4 a.m. on October 18, 2025. (Doc. 2-2, ¶24.) Petitioner

19   also claims that he was finally able to shower for the first time since his re-detention and that he

20   had been deprived of sleep for almost 48 hours. (*Id*.)

21       Petitioner claims that he has suffered numerous harms during his detention, including:

22   sleep deprivation, hygiene issues, food deprivation, severe emotional distress, being away from

23   family, inability to deal with symptomatic H. Pylori infection,[2] missing work and subsequent

24   inability to provide income for his family, inability to care for his wife with medical issues, and

25   inability to help support his 9-month-old baby. (Doc. 2-2, ¶25.)

26

27   [2] Documents provided by Respondent indicate that Petitioner did not claim to have any medical problems during his
     interaction with an ICE officer on October 16, 2025. (Doc. 10-2 at 5 ("Subject stated that he has no medical
28   problems").)

On October 29, 2025, Petitioner filed a petition for habeas relief, (Doc. 1), an ex parte motion for temporary restraining order (Doc. 2), and a motion to proceed via pseudonym (Doc. 3). At the time of filing, Petitioner's next scheduled immigration hearing was set for November 7, 2025. (Doc. 10-1, ¶11.)

On November 4, 2025, Respondents timely filed an opposition brief in which they waived oral argument on the Petition. (Doc. 10 at 14). Respondents indicated they do not oppose converting the TRO request into a PI request and do not request a hearing. (Doc. 10 at 2, n.1.) Petitioner timely filed a reply and does not request an evidentiary hearing nor object to converting the TRO motion into one for a preliminary injunction (Doc. 12 at 21).

## III.    LEGAL BACKGROUND

### A.    Statutory Immigration Framework (8 U.S.C. § 1225 and § 1226)

Two statutes govern the detention and removal of inadmissible noncitizens from the United States: 8 U.S.C. § 1226 and § 1225. In the interest of expedience, the Court relies here, as relevant, on the legal background accurately presented by the district court in *Salcedo Aceros v. Kaiser*, No. 25-CV-06924-EMC, 2025 WL 2637503 (N.D. Cal. Sept 12, 2025):

> ### A.    <u>Full Removal Proceedings and Discretionary Detention (§ 1226)</u>
>
> The "usual removal process" involves an evidentiary hearing before an immigration judge. *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 108 (2020). Proceedings are initiated under 8 U.S.C. § 1229(a), also known as "full removal," by filing a Notice to Appear with the Immigration Court. *Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 520 (BIA 2011). Section § 1226 provides that while removal proceedings are pending, a noncitizen "may be arrested and detained" and that the government "may release the alien on ... conditional parole." § 1226(a)(2); *accord Thuraissigiam*, 591 U.S. at 108 (during removal proceedings, applicant may either be "detained" or "allowed to reside in this country"). When a person is apprehended under § 1226(a), an ICE officer makes the initial custody determination. *Diaz v. Garland*, 53 F.4th 1189, 1196 (9th Cir. 2022) (citing 8 C.F.R. § 236.1(c)(8)). A noncitizen will be released if he or she "demonstrate[s] to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding." *Id.* (citing 8 C.F.R. § 236.1(c)(8)).
>
> "Federal regulations provide that aliens detained under § 1226(a) receive bond hearings at the outset of detention." *Jennings v. Rodriguez*, 583 U.S. 281, 306 (2018) (citing 8 CFR §§ 236.1(d)(1)).

If, at this hearing, the detainee demonstrates by the preponderance of the evidence that he or she is not "a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk," the IJ will order his or her release. *Diaz*, 53 F.4th at 1197 (citing *Matter of Guerra*, 24 I. & N. Dec. 37, 40 (B.I.A. 2006)). Once released, the noncitizen's bond is subject to revocation. Under 8 U.S.C. § 1226(b), "the DHS has authority to revoke a noncitizen's bond or parole 'at any time,' even if that individual has previously been released." *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 968 (N.D. Cal. 2019). However, if an immigration judge has determined the noncitizen should be released, the DHS may not re-arrest that noncitizen absent a change in circumstance. *See Panosyan v. Mayorkas*, 854 F. App'x 787, 788 (9th Cir. 2021). Where the release decision was made by a DHS officer, not an immigration judge, the Government's practice has been to require a showing of changed circumstances before re-arrest. *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1197 (N.D. Cal. 2017).

## B. Expedited Removal and Mandatory Detention (§ 1225)

While "§ 1226 applies to aliens already present in the United States," U.S. immigration law also "authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2)," a process that provides for expedited removal. *Jennings*, 583 U.S. at 303 (2018). Under § 1225, a noncitizen "who has not been admitted or who arrives in the United States" is considered "an applicant for admission." 8 U.S.C. § 1225(a)(1). For certain applicants for admission, 8 U.S.C. § 1225 authorizes "expedited removal." § 1225(b)(1). § 1225(b)(1) provides that:

> "If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 212(a)(6)(C) or 212(a)(7) [8 U.S.C. § 1182(a)(6)(C) or 1182(a)(7)], the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 208 [8 USCS § 1158] or a fear of persecution."

Sections 8 U.S.C. § 1182(a)(6)(C) and 1182(a)(7) respectively refer to noncitizens who are inadmissible due to misrepresentation or failure to meet document requirements. Clause (iii) of § 1225(b)(1) allows the Attorney General (who has since delegated the responsibility to the Department of Homeland Security Secretary) to designate for expedited removal noncitizens "who ha[ve] not been admitted or paroled into the United States, and who ha[ve] not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph." § 1225(b)(1)(A)(iii)(II).

To summarize, under § 1225(b)(1), two groups of noncitizens are subject to expedited removal. First, there are "arriving" noncitizens who are inadmissible due to misrepresentation or failure to meet document requirements. The implementing agency regulations define "arriving alien" as applicants for admission "coming or attempting to come into the United States at a port-of-entry." 8 C.F.R. § 1.2. The second group –designated noncitizens –includes noncitizens who meet all of the following criteria: (1) they are inadmissible due to lack of a valid entry document or misrepresentation; (2) they have not "been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility"; and (3) they are among those whom the Secretary of Homeland Security has designated for expedited removal. *Thuraissigiam*, 591 U.S. at 109; § 1225(b)(1).

"Initially, DHS's predecessor agency did not make any designation [under (3)], thereby limiting expedited removal only to 'arriving aliens,'" that is, noncitizens encountered at ports of entry. *Make the Rd. N.Y. v. Noem*, No. 25-cv-190 (JMC), 2025 U.S. Dist. LEXIS 169432, at *14 (D.D.C. Aug. 29, 2025). In the following years, DHS extended by designation expedited removal to noncitizens who arrive by sea and who have been present for fewer than two years, and to noncitizens apprehended within 100 air miles of any U.S. international land border who entered within the last 14 days. *Id.* This was the status quo until January 2025, when the Department of Homeland Security revised its § 1225 designation to "apply expedited removal to the fullest extent authorized by statute." Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025). Under this designation, expedited removal applies to noncitizens encountered *anywhere* within the United States, who have been in the United States for less than two years and are inadmissible for lack of valid documentation or misrepresentation. In short, expedited removal was expanded to apply for the first time to vast numbers of noncitizens present in the interior of the United States.

Under the expedited removal statute § 1225(b)(1), if an applicant "indicates either an intention to apply for asylum" or "a fear of persecution," the immigration officer "shall refer the alien for an interview by an asylum officer." §§ 1225(b)(1)(A)(i)–(ii). If the asylum officer determines that the applicant has a "credible fear," the applicant "receive[s] 'full consideration' of his asylum claim in a standard removal hearing." *Thuraissigiam*, 591 U.S. at 110. If the officer determines there is no "credible fear," the officer "shall order the alien removed from the United States without further hearing or review." § 1225(b)(1)(B)(iii). However, the officer's decision may be appealed by the applicant to an immigration judge, who must conduct the review "to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination." *Id.* Detention under § 1225(b)(1) is "mandatory" "pending a final determination of credible fear of persecution and if found not to have such a fear, until removed." *Id.* (citing § 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause shall be detained pending a final determination of credible

fear of persecution and, if found not to have such a fear, until removed.")

[Section] 1225 also contains a provision that applies to applicants for admission not covered by § 1225(b)(1). *Jennings*, 583 U.S. at 287. This provision, 1225(b)(2), states that, subject to statutory exceptions, "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a [full removal proceedings] of this title." § 1225(b)(2). In other words, noncitizens subject to 1225(b)(2) are not eligible for expedited removal but are subject to mandatory detention while their full removal proceedings are pending. This is in contrast to the default detention regime under § 1226(a), which allows for discretionary release and review of detention through a bond hearing.

## C. <u>The Government's Recent Change in Position</u>

Until this year, the DHS has applied § 1226(a) and its discretionary release and review of detention to the vast majority of noncitizens allegedly in this country without valid documentation. This practice was codified by regulation. The regulations implementing the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") state that "Despite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond redetermination." 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997). In fact, the government has conceded in other contexts that "DHS's long-standing interpretation has been that 1226(a) [discretionary detention] applies to those who have crossed the border between ports of entry and are shortly thereafter apprehended." Dkt. No. 17 (citing Solicitor General, Transcript of Oral Argument at 44:24–45:2, *Biden v. Texas*, 597 U.S. 785 (2022) (No. 21-954)) . . .

In 2025, however, the Government's policy changed dramatically. The DHS revised its § 1225 designation to "apply expedited removal *to the fullest extent authorized by statute.*" Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025) (emphasis added). The Secretary of Homeland Security memorandum directed federal immigration officers to "consider ... whether to apply expedited removal" to "any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied." Dkt. No. 1 at ¶ 33. Officers are encouraged to "take steps to terminate any ongoing removal proceeding and/or any active parole status." *Id.* The memorandum states that DHS shall take the actions contemplated by the memorandum "in a manner that takes account of legitimate reliance interests," but states that "the expedited removal process includes asylum screening, which is sufficient to protect the reliance interests of any alien who has applied for asylum or planned to do so in a timely manner." Huffman Memorandum (Jan. 23, 2025).

Since mid-May of 2025, the Department of Homeland Security has

> made a practice of appearing at regular removal proceedings in immigration court, moving to dismiss the proceedings, and then re-arresting the individual in order to place them in expedited removal proceedings. Dkt. No. 1 at ¶¶ 35–40. If the immigration judge does not dismiss the full removal proceedings, ICE still makes an arrest, apparently in reliance on § 1225(b)(2)'s detention provision.

*Salcedo Aceros*, 2025 WL 2637503 at *1-4 (internal footnotes omitted).

**B.    Parole Revocation**

In *Y-Z-H-L v. Bostock*, 2025 WL 1898025, at *10–12 (D. Or. July 9, 2025), the court

explained the parole process in immigration cases and noted that before parole may be revoked,

the parolee must be given written notice of the impending revocation, which must include a

cogent description of the reasons supporting the revocation decision. The court held:

> Section 1182 . . . has a subsection titled "Temporary admission of nonimmigrants," which allows noncitizens, even those in required detention, to be "paroled" into the United States. This provision, at issue in this case, states:

>> The Secretary of Homeland Security may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and **when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.**

> 8 U.S.C. § 1182(d)(5)(A).

*Y-Z-H-L v. Bostock*, 2025 WL 1898025, at *3 (emphasis added). *Y-Z-H-L* determined that under

the Administrative Procedure Act, immigration parolees are entitled to determinations related to

their parole revocations that are not arbitrary, capricious or an abuse of discretion. *Id*. at *10. An

agency acts arbitrarily and capriciously by failing to make a reasoned determination or where the

agency fails to "articulate[] a satisfactory explanation for its action including a rational

connection between the facts found and the choice made." *Id*. Parole revocations in the context of

the INA must occur on a case-by-case basis and may occur "when the purposes of such parole

shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall

forthwith return or be returned to the custody from which he was paroled." *Id*. at \*12 (quoting 8

C.F.R. § 212.5(e)). 8 C.F.R. § 212.5(e) requires written notice of the termination of parole except

where the immigrant has departed or when the specified period of parole has expired.

Applying *Y-Z-H-L* and § 212.5(e), *Mata Velasquez v. Kurzdorfer*, No. 25-CV-493-LJV,

2025 WL 1953796, at \*11 (W.D.N.Y. July 16, 2025), found that the INA requires a case-by-case

analysis as to the decision to revoke humanitarian parole:

> This Court agrees that both common sense and the words of the
> statute require parole revocation to be analyzed on a case-by-case
> basis and that a decision to revoke parole "must attend to the reasons
> an individual [noncitizen] received parole." *See id*. There is no
> indication in the record that the government conducted any such
> analysis here. On the contrary, the letter Mata Velasquez received
> merely stated summarily that DHS had "revoked [his] parole."
> Docket Item 62-1 at 5. Thus, there is no indication that—as required
> by the statute and regulations—an official with authority made a
> determination specific to Mata Velasquez that either "the purpose for
> which [his] parole was authorized" has been "accomplish[ed]" or that
> "neither humanitarian reasons nor public benefit warrants [his]
> continued presence...in the United States." *See* 8 C.F.R.
> § 212.5(e)(2)(i). As a result, DHS's revocation of Mata Velasquez's
> parole violated his rights under the statute and regulations. *See Y-Z-
> L-H*, 2025 WL 1898025, at \*13.

In *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, ___ F. Supp. 3d ___, 2025 WL 2084921, at \*3 (N.D.

Cal. July 24, 2025), the court reached a similar conclusion relying on the Due Process Clause:

> . . . **even when ICE has the initial discretion to detain or release
> a noncitizen pending removal proceedings, after that individual
> is released from custody she has a protected liberty interest in
> remaining out of custody**. *See Romero v. Kaiser*, No. 22-cv-02508,
> 2022 WL 1443250, at \*2 (N.D. Cal. May 6, 2022) ("[T]his Court
> joins other courts of this district facing facts similar to the present
> case and finds Petitioner raised serious questions going to the merits
> of his claim that due process requires a hearing before an IJ prior to
> re-detention."); *Jorge M. F. v. Wilkinson*, No. 21-cv-01434, 2021
> WL 783561, at \*2 (N.D. Cal. Mar. 1, 2021); *Ortiz Vargas v.
> Jennings*, No. 20-cv-5785, 2020 WL 5074312, at \*3 (N.D. Cal. Aug.
> 23, 2020); *Ortega*, 415 F. Supp. 3d at 969 ("Just as people on
> preparole, parole, and probation status have a liberty interest, so too
> does [a noncitizen released from immigration detention] have a
> liberty interest in remaining out of custody on bond.").

*Id.* (emphasis added). Other courts, including this Court, have held similarly. *Doe v. Becerra*, No.

2:25-CV-00647-DJC-DMC, 2025 WL 691664, at *4 (E.D. Cal. Mar. 3, 2025); *see also Padilla v. U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1172 (W.D. Wash. 2023) ("The Supreme Court has consistently held that non-punitive detention violates the Constitution unless it is strictly limited, and, typically, accompanied by a prompt individualized hearing before a neutral decisionmaker to ensure that the imprisonment serves the government's legitimate goals.").

**IV.    ANALYSIS**

**A.    Jurisdiction**

  1.    Habeas Corpus

  Under 28 U.S.C. § 2241, the Court has the authority to determine a petition for writ of habeas corpus in which the petitioner asserts he is being held in custody "in violation of the Constitution or laws or treaties of the United States." "The essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). Petitioner seeks his immediate release from custody, which he contends violates the Constitution of the United States. (*See* Doc. 1.) Thus, he properly invokes the Court's habeas jurisdiction.

  2.    Judicial Review under the INA

  The INA limits judicial review in many instances. Though 8 U.S.C § 1252(g) precludes this Court from exercising jurisdiction over the executive's decision to "commence proceedings, adjudicate cases, or execute removal orders against any alien," there is no removal order at issue here and the central issue is Petitioner's continued detention. Thus, this Court has the authority to review the termination of Petitioner's release. *See Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018) (holding that § 1252(g) precludes judicial review only as to the three areas specifically outlined in the subsection); *see also Reno v. American–Arab Anti–Discrimination Comm.*, 525 U.S. 471, 482 (1999).

**B.    Preliminary Injunction**

  The standard for issuing a TRO is the same as the standard for issuing a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001) (explaining that the analysis for temporary restraining orders and preliminary injunctions is

12

1    "substantially identical"). When seeking a TRO or PI, plaintiffs must establish: (1) they are

2    "likely to succeed on the merits" of their claims, (2) they are "likely to suffer irreparable harm in

3    the absence of a preliminary injunction," (3) "the balance of equities tips in [their] favor" and (4)

4    "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20

5    (2008). The moving party has the burden to "make a showing on all four prongs" of the *Winter*

6    test to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

7    1135 (9th Cir. 2011). Thus, the moving party has "the burden of persuasion." *Mazurek v.*

8    *Armstrong*, 520 U.S. 968, 972 (1997); *Hecox v. Little*, 104 F.4th 1061, 1073 (9th Cir. 2023). The

9    Court may weigh the request for a preliminary injunction with a sliding-scale approach. *Alliance*,

10   at 1135 (9th Cir. 2011). Accordingly, a stronger showing on the balance of hardships may support

11   the issuance of a preliminary injunction where there are "serious questions on the merits … so

12   long as the plaintiff also shows that there is a likelihood of irreparable injury and that the

13   injunction is in the public interest." *Id*. "A preliminary injunction is an extraordinary remedy

14   never awarded as of right." *Winter*, 555 U.S. at 24. Preliminary injunctions are intended to

15   "merely to preserve the relative positions of the parties until a trial on the merits can be held, and

16   to balance the equities at the litigation moves forward." *Lackey v. Stinnie*, 604 U.S. ___, 145 S.

17   Ct. 659, 667 (2025) (citations omitted).

18       The status quo refers to "the last uncontested status which preceded the pending

19   controversy." *Tanner Motor Livery, Ltd. v. Avis, Inc*., 316 F.2d 804, 809 (9th Cir. 1963) (quoting

20   *Westinghouse Elec. Corp. v. Free Sewing Mach. Co*., 256 F.2d 806, 808 (7th Cir. 1958)). In the

21   Court's view, that is the status before Petitioner was arrested. *See Kuzmenko v. Phillips,* No. 25-

22   CV-00663, 2025 WL 779743, at *3 (E.D. Cal. Mar. 10, 2025) (granting a temporary restraining

23   order requiring immediate release of the petitioner back to home confinement from custody, as a

24   restoration of the status quo).

25       Even if the Court's action here constitutes a mandatory injunction,[3] the evidence supports

26

27

28

---

[3] "A prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co*., 571 F.3d 873, 879 (9th Cir. 2009) (internal citations omitted). In other words, a prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits." *Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983). A mandatory injunction, on the other hand, "orders a responsible party to 'take action.'" *Marlyn Nutraceuticals*, 571 F.3d at 879 (quoting

1   that action. O.P.A.M. alleges he has suffered and is suffering violations of his substantive and

2   procedural due process rights and that his continued unlawful detention will impose on him

3   serious injury if the injunction is not issued. The injunction issued here is on firm legal footing

4   and the result does not appear to be doubtful either; due process clearly requires that O.P.A.M. be

5   given a hearing before his bond is revoked. These injuries are not capable of redress through

6   monetary compensation. Accordingly, injunctive relief is appropriate even under the higher

7   standard for mandatory injunctions.[4]

8            1.    <u>Likelihood of Success on the Merits</u>

9        This first factor "is the most important" under *Winter*, and "is especially important when a

10   plaintiff alleges a constitutional violation and injury." *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th

11   Cir. 2023). Petitioner contends that his re-detention and continued detainment violates both

12   substantive and procedural due process. (*See generally* Doc. 2 at 12-17.)

13           a.    *Respondents Rely on an Incorrect Interpretation of § 1225 for the*

14                *Authority to Detain Respondent*

15       Respondents maintain Petitioner's detention is "mandatory" under 1225(b) while his

16   removal proceedings are pending. (Doc. 10 at 6–10.) The various legal arguments relied upon by

17   DHS to support this assertion have been rejected by this Court in other proceedings. *See, e.g.*,

18   *Ortiz Donis v. Chestnut*, 1:25-CV-01228-JLT, 2025 WL 2879514 at *3–6 (E.D. Cal. Oct. 9,

---

*Meghrig v. KFC W., Inc*., 516 U.S. 479, 484 (1996)). Although subject to a higher standard, a mandatory injunction is permissible when "extreme or very serious damage will result" that is "not capable of compensation in damages," and the merits of the case are not "doubtful." *Id*. (internal citations and quotation marks omitted).

[4] The government questions whether the Court can order preliminary relief of the nature requested here because it is akin to the relief requested in the underlying § 2241 petition. (Doc. 10 at 6.) The government cites *Senate of Cal. v. Mosbacher*, 968 F.2d 974, 978 (9th Cir. 1992), which indeed held that entering "judgment on the merits in the guise of preliminary relief is a highly inappropriate result." The circumstances of that case were quite different. In *Mosbacher*, the trial court ordered as preliminary relief the release of data that the defendant sought to keep private and thus, had the Ninth Circuit not reversed, the defendant would "have lost the whole case for all practical purposes." *Id*. Some district courts have relied on this line of cases to deny immigration detainee's requests for release at the TRO stage. *See, e.g., Mendez v. U.S. Immigr. & Customs Enf't*, No. 23-CV-00829-TLT, 2023 WL 2604585, at *3 (N.D. Cal. Mar. 15, 2023) (citing *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *Keo v. Warden of Mesa Verde Ice Processing Center*, No. 1:24-cv-00919-HBK, 2024 WL 3970514 (E.D. Cal. Aug. 28, 2024) (citing *Mendez, Mosbacher*, and *Comenisch*). But a closer look at *Camenisch* reveals that the Supreme Court did not intend to bar TROs of the kind requested here. Rather, *Camenisch* stands for the proposition that "findings of fact and conclusions of law made by a court in a preliminary injunction or TRO posture are preliminary and do not bind the court at the trial on the merits. Thus, it is not appropriate to enter a final judgment at a TRO stage." *Doe v. Noem*, 778 F. Supp. 3d 1151, 1167 (W.D. Wash. 2025) (evaluating government argument based on *Comenisch*).

2025). The Court disagrees that the government's recent re-interpretation of the relationship between § 1225 and § 1226 is correct such that detention is not "mandatory" in this case.[5] Notably, Petitioner has been present in the United States for approximately a year and released on his own recognizance before Respondents adopted the new interpretation of the governing statutes.

> b.    *Due Process Protections*

Petitioner contends that his continued detention violates his due process rights. (*See* Doc. 2 at 12-17.) In *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, ___ F. Supp. 3d ___, 2025 WL 2084921, at *3 (N.D. Cal. July 24, 2025), the court held,

> . . . **even when ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody she has a protected liberty interest in remaining out of custody**. *See Romero v. Kaiser*, No. 22-cv-02508, 2022 WL 1443250, at *2 (N.D. Cal. May 6, 2022) ("[T]his Court joins other courts of this district facing facts similar to the present case and finds Petitioner raised serious questions going to the merits of his claim that due process requires a hearing before an IJ prior to re-detention."); *Jorge M. F. v. Wilkinson*, No. 21-cv-01434, 2021 WL 783561, at *2 (N.D. Cal. Mar. 1, 2021); *Ortiz Vargas v. Jennings*, No. 20-cv-5785, 2020 WL 5074312, at *3 (N.D. Cal. Aug. 23, 2020); *Ortega*, 415 F. Supp. 3d at 969 ("Just as people on preparole, parole, and probation status have a liberty interest, so too does [a noncitizen released from immigration detention] have a liberty interest in remaining out of custody on bond.").

*Id.* (emphasis added). Other courts, including this Court, have held similarly. *Doe v. Becerra*, No. 2:25-CV-00647-DJC-DMC, 2025 WL 691664, at *4 (E.D. Cal. Mar. 3, 2025); *see also Padilla v. U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1172 (W.D. Wash. 2023) ("The Supreme Court has consistently held that non-punitive detention violates the Constitution unless it is strictly limited, and, typically, accompanied by a prompt individualized hearing before a neutral decisionmaker to ensure that the imprisonment serves the government's legitimate goals.").[6]

---

[5] Respondents argue that "Petitioner's detention is under 1225(b), not § 1226(b)" and "1226(b) cannot apply because Petitioner never legally entered the United States. And § 1225(b) detention does not permit—let alone compel—release based on a lack of dangerousness or flight risk." (Doc. 10 at 9.) This argument is discussed in greater detail below.

[6] Respondents rely on cases about the due process rights of aliens in different contexts. For example, they argue:

> An alien who has not effected a legal entry, i.e., has not been admitted into the United States, is entitled only to "[w]hatever the procedure authorized by Congress is." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) (quoting *United States ex rel. Knauff v. Shaughnessy*, 338

Even assuming Respondents are correct that § 1225(b) is the applicable detention authority for all "applicants for admission," Respondents fail to contend with the liberty interest created by the fact that the Petitioner in this case was released on recognizance in August 2024, *prior to the manifestation of this interpretation*.

Thus, the Court must evaluate the three-part test set forth in *Mathews v. Eldridge,* 424 U.S. 319, 334-335 (1976), to determine whether the procedures (or lack thereof) that have been applied to Petitioner are sufficient to protect the liberty interest at issue. *Pinchi*, 2025 WL 2084921 at *3.[7] In *Mathews*, the Court determined the following:

> [O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute

U.S. 537, 544 (1950)); *see also Thuraissigiam*, 591 U.S. at 140 (an alien detained after unlawful entry "has only those rights regarding admission that Congress has provided by statute"); *Angov v. Lynch*, 788 F.3d 893, 898 (9th Cir. 2015) (for "those . . . who have never technically 'entered' the United States . . . procedural due process is simply whatever the procedure authorized by Congress happens to be" (cleaned up)). This makes sense, since "an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application." *Barrera-Echavarria*, 44 F.3d at 1449. Put succinctly, "applicants for admission have virtually no constitutional rights regarding their applications." *Valencia v. Mukasey*, 548 F.3d 1261, 1263 (9th Cir. 2008) (citing *Landon v. Plasencia*, 459 U.S. 21, 33-34 (1982)). "Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Shaughnessy*, 338 U.S. at 544.

(Doc. 10 at 7.) However, as one thorough decision recently issued in the District of Arizona explained, *Thuraissigiam* is distinguishable:

> In *Thuraissigiam* the Supreme Court held that a petitioner who was stopped at the border did not have any due process rights regarding admission into the United States. *Thuraissigiam*, 591 U.S. at 107. In contrast, the pending § 2241 petition does not challenge any determination regarding [petitioner's] admissibility into the United States, but instead involves a challenge to her detention pending the conclusion of her removal proceedings.

*Rosado v. Figueroa*, No. CV 25-02157 PHX DLR (CDB), 2025 WL 2337099, at *15 (D. Ariz. Aug. 11, 2025), *report and recommendation adopted sub nom. Rocha Rosado v. Figueroa*, No. CV-25-02157-PHX-DLR (CDB), 2025 WL 2349133 (D. Ariz. Aug. 13, 2025).

[7] Respondent argues (Doc. 10 at 10) that the Court should not apply *Mathews,* citing the Ninth Circuit's ruling in *Rodriguez Diaz*, 53 F.4th 1206, which noted that the Supreme Court, "when confronted with constitutional challenges to immigration detention has not resolved the, through express application of Mathews." Yet, after noting that other circuits have applied the *Mathews* test to immigration detention issues and the Ninth Circuit has applied *Mathews* in other immigration contexts, *Rodriguez Diaz* went on to "assume without deciding" that *Mathews* applied in the immigration context. *Id.* at 1207.

1    procedural requirement would entail.

2         As to private interest, during his approximately one year on parole, M.V.I. pursued gainful

3    employment, had a child, and solidified his relationship with his immediate and extended family.

4    Thus, parole allowed him to build a life outside detention, albeit under the terms of that parole.

5    Petitioner has a substantial private interest in being out of custody and his detention denies him

6    that liberty interest. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) ("Freedom from

7    imprisonment—from government custody, detention, or other forms of physical restraint—lies at

8    the heart of the liberty that [the Due Process] Clause protects.").

9         The Court finds there is at least some risk of erroneous deprivation under the present

10   circumstances. This record suggests that Petitioner may have violated the terms of his release by

11   missing multiple biometric check-ins, (Doc. 10-1, ¶9), and he does acknowledge submitting a late

12   check-in photo on multiple occasions. (Doc 2-2, ¶13.) Thus, there appears to have possibly been a

13   change of circumstance warranting revocation of his parole. Even still, the remaining question is

14   whether this change is sufficient to warrant continued detention. As argued by Petitioner, he

15   communicated the reasons for his delayed submissions promptly to his ISAP officer and never

16   received "any formal warnings, threats of arrest, or formal notice of non-compliance from ISAP

17   officials" regarding these delayed submissions. (Doc 2-2, ¶13.) The Court cannot state with

18   certainty that these missed biometric check-ins constitute changed circumstances sufficient to

19   convince an IJ that detention is required.

20        The Supreme Court has held that "the Constitution requires some kind of a hearing *before*

21   the State deprives a person of liberty or property." *See Zinermon v. Burch*, 494 U.S. 113, 127

22   (1990) (emphasis in original). However, the Court also recognized that there may be situations

23   that urgently require arrest, in which a prompt post-deprivation hearing is appropriate. *Id.* at 128

24   (noting there may be "special case[s]" where a pre-deprivation hearing is impracticable);

25   *Guillermo M. R. v. Kaiser*, No. 25-CV-05436-RFL, 2025 WL 1983677, at *9 (N.D. Cal. July 17,

26   2025) ("absent evidence of urgent concerns, a *pre*-deprivation hearing is required to satisfy due

27   process, particularly where an individual has been released on bond by an IJ"). The rapidly

28   developing caselaw on this subject gives limited guidance as to where this line should be drawn.

Some courts that have addressed detention-related habeas petitions brought by persons released with enhanced supervision conditions have required pre-deprivation process, but in somewhat different circumstances. In *E.A.T.-B. v. Wamsley*, No. C25-1192-KKE, 2025 WL 2402130, at *4 (W.D. Wash. Aug. 19, 2025), the district court ordered the release of a petitioner arrested by ICE immediately after appearing in immigration court. That court agreed with the petitioner that ICE's post hoc explanation that violations warranted his detention was pretextual, given that ICE first became aware of petitioner's alleged violations a few hours before his immigration hearing, DHS did not raise those violations at the hearing or argue the petitioner should be detained for any reason, and the petitioner was then provided multiple, inconsistent justifications for his arrest. *Id*. In *Arzate v. Andrews*, No. 1:25-CV-00942-KES-SKO (HC), 2025 WL 2230521, at *7 (E.D. Cal. Aug. 4, 2025), converted to preliminary injunction sub nom, 2025 WL 2411010, at *1 (E.D. Cal. Aug. 20, 2025), the court ordered immediate release of in immigration detainee who had been in compliance with his conditions of release, even though he had incurred a misdemeanor arrest while on parole, in part because no charges were ever filed.

In contrast, this Court ordered a bond hearing in *Martinez Hernandez v. Andrews*, No. 1:25-CV-01035 JLT HBK, 2025 WL 2495767 (E.D. Cal. Aug. 28, 2025), where the petitioner's records indicated numerous violations. Though Martinez Hernandez offered explanations for the violations and there was a dispute of fact as to whether the violations occurred, ICE's reliance upon those violations was "not obviously pretextual." *Id*. at * 12 ("If Respondent's view of the facts is correct, it is at least arguable that providing Petitioner with notice and a pre-deprivation hearing would have been impracticable and/or would have motivated his flight."). As this Court noted in *Martinez Hernandez*:

> In similar circumstances, courts have refused to release the petitioners but have ordered timely bond hearings. *Carballo v. Andrews*, No. 1:25-CV-00978-KES-EPG (HC), 2025 WL 2381464, at *8 (E.D. Cal. Aug. 15, 2025), citing *Perera v. Jennings*, et. al, No. 21-CV-04136-BLF, 2021 WL 2400981, at *5 (N.D. Cal. June 11, 2021); *Pham v. Becerra*, No. 23-CV-01288-CRB, 2023 WL 2744397, at *6 (N.D. Cal. Mar. 31, 2023). "[A]llowing a neutral arbiter to review the facts would significantly reduce the risk of erroneous deprivation." *Guillermo M. R. v. Kaiser*, No. 25-CV-05436-RFL, 2025 WL 1983677, at *8 (N.D. Cal. July 17, 2025). Thus, the Court concludes that prompt, post-deprivation process is required here.

1  *Id*. Finally, as other courts have done, this Court concludes that the government's interest in

2  detaining Petitioner without proper process is slight. In sum, the Court concludes that he has

3  demonstrated a likelihood of success on the merits on his procedural due process claim.

### C.  Irreparable Harm

5  "It is well established that the deprivation of constitutional rights 'unquestionably

6  constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting

7  *Elrod v. Burns*, 427 U.S. 247, 272 (1976)). Moreover, "[t]he Ninth Circuit has recognized

8  'irreparable harms imposed on anyone subject to immigration detention' including 'the economic

9  burdens imposed on detainees and their families as a result of detention.'" *Hernandez v. Sessions*,

10  872 F.3d 976, 995 (9th Cir. 2017); *Leiva-Perez v. Holder*, 640 F.3d 962, 969-970 (9th Cir. 2011)

11  (the inability to pursue a petition for review may constitute irreparable harm). The Petitioner has

12  established irreparable harm.

### D.  Balance of the Harms/Public Interest

14  Because the interest of the government is the interest of the public, the final two factors

15  merge when the government is the opposing party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009). The

16  Court agrees with the analysis of *Pinchi,* and finds it correctly addresses the situation here:

> "[T]he public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." *Jorge M. F.*, 2021 WL 783561, at *3 (cleaned up) (quoting *Ortiz Vargas*, 2020 WL 5074312, at *4, and then quoting *Hernandez*, 872 F.3d at 996); see also *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."). Without the requested injunctive relief, Petitioner-Plaintiff faces the danger of significant health consequences and deprivation of her liberty. Yet the comparative harm potentially imposed on Respondents-Defendants is minimal—a mere short delay in detaining Petitioner-Plaintiff, should the government ultimately show that detention is intended and warranted. Moreover, a party "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. U.S. Immigr. & Nat. Serv.*, 753 F.2d 719, 727 (9th Cir. 1983).
>
> This Court therefore joins a series of other district courts that have recently granted temporary restraining orders barring the government from detaining noncitizens who have been on longstanding release in their immigration proceedings, without first

1
2
3
4
5
6
7

> holding a pre-deprivation hearing before a neutral decisionmaker. *See, e.g., Diaz v. Kaiser*, No. 25-cv-05071, 2025 WL 1676854, at *2 (N.D. Cal. June 14, 2025); *Garcia v. Bondi*, No. 25-cv-05070, 2025 WL 1676855, at *3 (N.D. Cal. June 14, 2025). Although Petitioner filed her motion shortly after being detained, rather than immediately beforehand, the same reasoning applies to her situation. Her liberty interest is equally serious, the risk of erroneous deprivation is likewise high, and the government's interest in continuing to detain her without the required hearing is low. *See Doe v. Becerra*, No. 2:25-cv-00647-DJC-DMC, 2025 WL 691664, at *6 (E.D. Cal. Mar. 3, 2025) (granting a TRO as to an individual who had been detained over a month earlier).

8
9
10

*Pinchi*, at *3. In addition, there appears to be no dispute that there is no evidence that Petitioner poses a risk of flight or a danger to the community. For these reasons and those set forth in *Pinchi*, the Court concludes that the equities and public interest weigh in favor of Petitioner.

11

**E.  Bond**

12
13
14
15
16
17
18
19
20

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Court has "discretion as to the amount of security required, if any," and it "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (citation modified). Because "the [Government] cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations," *Zepeda*, 753 F.2d at 727, the Court finds that no security is required here.

21

**F.     Burden of Proof**

22
23
24
25
26
27
28

Petitioner requests that the Court order Petitioner released from custody and barred from re-arrest in a subsequent action without a hearing before a neutral adjudicator. (*See* Doc. 2 at 29.) In *Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022), the Ninth Circuit considered whether a noncitizen detained under § 1226(a) pending removal proceedings had a right to a second bond hearing where the government would have the burden to establish by clear and convincing evidence that his continued detention was justified. *Rodriguez Diaz* concluded that due process did not require that procedure, reasoning in part that:

1

2

3

4

> Nothing in this record suggests that placing the burden of proof on the government was constitutionally necessary to minimize the risk of error, much less that such burden shifting would be constitutionally necessary in all, most, or many cases. There is no reason to believe that, as a general proposition, the government will invariably have more evidence than the alien on most issues bearing on alleged lack of future dangerousness or flight risk.

5

6

7

8

9

10

*Id.* at 1212. However, *Rodriguez Diaz* "held only that a noncitizen detained under section 1226(a) does not have a right to a second bond hearing when the only changed material condition since their first bond hearing is the duration of their detention." *Pinchi*, 2025 WL 2084921, at *4. It did not address the burden of proof applicable under the present circumstances.

> *Pinchi* went on to discuss why the calculus changes for an individual who had been paroled from immigration custody after their initial detention:

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> Even assuming arguendo that the post-detention bond hearing provided under section 1226(a) provides constitutionally sufficient process for those noncitizens who never previously been detained and released by DHS, [Petitioner's] circumstance is different. Her release from ICE custody after her initial apprehension reflected a determination by the government that she was neither a flight risk nor a danger to the community, and [she] has a strong interest in remaining at liberty unless she no longer meets those criteria. The regulations authorizing ICE to release a noncitizen from custody require that the noncitizen "demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons" and that the noncitizen is "likely to appear for any future proceeding." 8 C.F.R. § 1236.1(c)(8). Release [therefore] reflects a determination by the government that the noncitizen is not a danger to the community or a flight risk." *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017), aff'd sub nom. *Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018). [Petitioner] was apprehended by ICE officers when she crossed the border into the United States [ ]. ICE then released her on her own recognizance. As ICE was not authorized to release [her] if she was a danger to the community or a flight risk, the Court must infer from [her] release that ICE determined she was neither. [Her] release from ICE custody constituted an "implied promise" that her liberty would not be revoked unless she "failed to live up to the conditions of her release." *Morrissey*, 408 U.S. at 482. The regulatory framework makes clear that those conditions were that she remain neither a danger to the community nor a flight risk. [She] justifiably relied on the government's implied promise in obtaining employment, taking on financial responsibility for her family members, and developing community relationships. The more than two years that she has spent out of custody since ICE initially released her have only heightened her liberty interest in remaining out of detention. Accordingly, [her] private interest in retaining her liberty is significant.

21

*Pinchi*, 2025 WL 2084921, at *4.

This reasoning contributed to the conclusion in *Pinchi* that a pre-deprivation hearing was required under *Mathews*. The Court in *Pinchi* also placed the burden at any such hearing on the government to demonstrate to a neutral decisionmaker by clear and convincing evidence that re-detention is necessary to prevent danger to the community or flight. *Id*. at *7. Doing so is logical even for a post-detention custody hearing for the reasons articulated in *Pinchi*–namely that the immigrant's initial release reflected a determination by the government that the noncitizen is not a danger to the community or a flight risk. Since it is the government that initiated re-detention, it follows that the government should be required to bear the burden of providing a justification for the re-detention.

## V.    CONCLUSION AND ORDER

1.    Petitioner's Motion for Temporary Restraining Order (Doc. 2) is converted to a Motion for Preliminary Injunction, and it is **GRANTED in PART**.

2.    Petitioner **SHALL** be provided a *substantive* bond hearing **no later than November 26, 2025** at which the Immigration Judge will determine whether Petitioner poses a risk of flight or a danger to the community if he is released.

3.    At the hearing, the Government **SHALL** bear the burden of establishing, by clear and convincing evidence, that Petitioner poses a danger to the community or a risk of flight, and Petitioner **SHALL** be allowed to have counsel present.

4.    The government may file a further brief on the merits of the habeas petition within 45 days. Alternatively, as soon as it can within that 30-day period, the government may file a notice that it does not intend to file further briefing. If the government files an additional brief, Petitioner may file a further brief within 30 days thereafter.

5.    The matter is referred to the assigned magistrate judge for consideration of the merits of the petition as quickly as possible.

IT IS SO ORDERED.

Dated:    **November 12, 2025**

UNITED STATES DISTRICT JUDGE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28